UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| L.R.M., | Case No.  23-cv-02647-LJC |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Martin O'Malley, | |
| Defendant. | Re: ECF Nos. 14, 19 |

Plaintiff L.R.M.[1] challenges the final decision of Defendant Martin O'Malley, Commissioner of Social Security (the Commissioner),[2] denying her application for disability insurance benefits under Title II of the Social Security Act.  Both parties consented to magistrate judge jurisdiction (ECF Nos. 9, 10) and moved for summary judgment.  ECF Nos. 19, 24.  L.R.M. did not file a reply in support of her Motion for Summary Judgment or in opposition to the Commissioner's Cross-Motion for Summary Judgment.  Having considered the parties' briefing, and for the reasons discussed below, L.R.M.'s Motion for Summary Judgment is **GRANTED**, the Commissioner's Cross-Motion for Summary Judgment is **DENIED**, and this matter is **REMANDED** for further proceedings.

//

//

---

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the plaintiff only by her initials.  This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Martin O'Malley was sworn in as Commissioner of Social Security on December 20, 2023, and is therefore automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

# I.    BACKGROUND

## A.    Factual Background

L.R.M. is a 45-year-old woman from Ukiah, California who has several severe physical and mental impairments, including reflex sympathetic dystrophy (RSD), lumbar spondylosis, depressive and anxiety disorders, and polysubstance abuse, including alcohol, marijuana, and prescription narcotics.  ECF No. 10-3 at 16.[3]  RSD is a "chronic conditions characterized by severe burning pain, most often affecting one of the extremities (arms, legs, hands, or feet)."  New York State Department of Health, *Reflex Sympathetic Dystrophy (RSD) Syndrome*, https://www.health.ny.gov/diseases/chronic/reflex_sympathetic/ (last visited July 17, 2024). Lumbar spondylosis is a "age-related change of the bones (vertebrae) and discs of the spine." Kaiser Permanente, Health Encyclopedia, *Lumbar Spondylosis*, https://healthy.kaiserpermanente.org/health-wellness/health-encyclopedia/he.Lumbar-Spondylosis.abr8401 (last visited July 17, 2024).

L.R.M. lives with her husband, her three children, and her three grandchildren.  ECF No. 10-3 at 37–39.  L.R.M. received her "high school equivalency" in 2008.  *Id.* at 40.  In February 2018, she was working at a school district cafeteria ordering, cooking, and serving food to more than 500 students.  *Id.* at 41–42.  But she reportedly had to stop working because she was starting to lose her balance and had constant pain in her lower back and left leg, especially when bending and squatting, and the pain had not subsided even with medication.  *Id.* at 47, 50.  L.R.M. also has nerve problems in both hands, although she reports that the right hand is worse than the left.  *Id.* at 51.  She will randomly drop things (especially when it is cold out) and she cannot comb or brush her hair.  *Id.* at 52.  L.R.M. also admits to being an alcoholic and drinking nine to twenty beers each day.  *Id.* at 63.  She has a long history of anxiety with panic attacks and posttraumatic stress disorder (PTSD).  ECF No. 108-8 at 250.  L.R.M. first experienced these symptoms approximately twenty years ago, and compared to when they first began, she reports that her symptoms now are worse and more persistent.  *Id.*  In addition, L.R.M. has a "distant history" of suicide attempts and

---

[3] Unless specified otherwise, the Court refers to the PDF page number generated by the Court's e-filing system.

1   prior psychiatric hospitalizations.  *Id.* at 251.

2       **B.       Procedural History**

3       L.R.M. previously filed a past application for Title II disability benefits in July 2017 that

4   was denied in November 2017, but that application was not administratively appealed.  ECF No.

5   10-7 at 22–23.  On December 11, 2018, L.R.M. applied again for Title II disability benefits, with

6   an alleged onset disability date of February 28, 2018.  ECF No. 10-6 at 2–3.  Her application was

7   denied on February 15, 2019.  ECF No. 10-5 at 2–6.  Her request for reconsideration of the initial

8   decision was denied on March 25, 2019.  *Id.* at 9–14.  On January 28, 2020. Administrative Law

9   Judge K. Kwon held a hearing on L.R.M.'s application, at which she represented herself.  ECF

10  No. 10-3 at 87–119.  On December 15, 2020, the ALJ issued an unfavorable decision against

11  L.R.M.  ECF No. 10-4 at 37–55.

12      L.R.M. appealed the ALJ's decision to the Appeals Council, which remanded the case

13  back to the ALJ for rehearing on September 21, 2021.  *Id.* at 56.  The Appeals Council found that

14  further evaluation of the prior administrative medical findings was necessary under 20 C.F.R.

15  § 404.1520c.  *Id.* at 57.  On January 18, 2022, the ALJ held a new hearing at which L.R.M. again

16  represented herself.  ECF No. 10-3 at 33–75.  On March 29, 2022, the ALJ issued another

17  unfavorable decision against L.R.M.  *Id.* at 9–32.  L.R.M. again appealed the ALJ's decision to the

18  Appeals Council, but on March 29, 2023, the Appeals Council found "no reason to review" the

19  ALJ's findings.  *Id.* at 2–6.  At that point, the ALJ's March 2022 decision became the final

20  decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  L.R.M. filed the present action

21  seeking judicial review of the ALJ's decision on May 28, 2024.  *See* ECF No. 1.

22  **II.      STANDARD OF REVIEW**

23      Under Title II of the Social Security Act, disability insurance benefits are available when

24  an eligible claimant is unable to "engage in any substantial gainful activity by reason of any

25  medically determinable physical or mental impairment . . . which has lasted or can be expected to

26  last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).[4]  To

27  ───────────────

28  [4] Because the Title II and Title XVI regulations are identical, only the Title II regulations are cited
    herein.

United States District Court
Northern District of California

determine a claimant's eligibility for benefits, the ALJ engages in a five-step sequential evaluation process to determine whether a claimant is disabled under the Act.  20 C.F.R. § 404.1520(a)(1). To establish disability, the claimant bears the burden of showing (1) that they are not working; (2) that they have a severe physical or mental impairment or a combination of impairment(s) that is severe; (3) that the impairment(s) meet or equal the requirements of a listed impairment; and (4) that their residual functional capacity (RFC) precludes them from performing their past relevant work.  *Id.* § 404.1520(a)(4).  At step five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in significant numbers in the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).  If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step.  20 C.F.R. § 404.1520(a)(4).

Pursuant to 42 U.S.C. § 405(g), a district court has authority to review a Commissioner's decision to deny disability benefits to a claimant.  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The district court's role is "to ensure that the [ALJ's] decision was supported by substantial evidence and a correct application of the law." *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  The Court must "consider the entire record as a whole, 'weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). "Where the evidence can reasonably support either affirming or reversing the decision, [this Court] may not substitute [its] judgment for that of the Commissioner." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

//

//

United States District Court
Northern District of California

4

### III.    DISCUSSION

L.R.M. raises several challenges to the ALJ's decision.  She argues that that the ALJ erred in her evaluation of L.R.M.'s subjective symptom testimony, the medical opinion evidence, and the third-party witness testimony.  ECF No. 14 at 14–24.  L.R.M. also challenges the ALJ's assessment of her RFC and the ALJ's findings at step five of the five-step sequential evaluation process.  *Id.* at 24–26, 27–29.  L.R.M. separately argues that ALJ failed in her heightened duty to fully develop the record given that L.R.M. was both self-represented during the administrative proceedings and suffered from mental impairments.  *Id.* at 26–27.  Finally, L.R.M. requests that the Court remand to the SSA for an immediate award of benefits under the Ninth Circuit's "credited-as-true" rule.  *Id.* at 29–30.

### A.    L.R.M.'s Subjective Symptom Testimony

L.R.M. argues that the ALJ failed to provide clear and convincing reasons supported by substantial evidence for discounting her symptom testimony.  ECF No. 14 at 21–23.  The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited."  *Trevizo,* 871 F.3d at 678.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.* (quoting *Garrison v. Colvin,* 759 F.3d 995, 1014–15 (9th Cir. 2014)).   If the claimant meets this requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases."  *Id.*  To satisfy the "clear and convincing reasons" requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Brown-Hunter v. Colvin,* 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick,* 157 F.3d at 722).[5]

---

[5] In a footnote in the Cross-Motion for Summary Judgment, the Commissioner asserts that the "clear and convincing reasons standard" is "inconsistent with the deferential substantial evidence standard set forth in 42 U.S.C. § 405(g), as well as agency regulations and rulings specifying the rationale its adjudicators should provide in support of their findings."  ECF No. 19 at 4, n.1.  This

United States District Court
Northern District of California

In weighing the claimant's credibility, the ALJ may consider many factors, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)).  The ALJ's reasons also must be supported by substantial evidence in the record. *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002).

Here, the ALJ found during step four of the five-step sequential evaluation process that L.R.M.'s medically determinable impairments could reasonably be expected to produce the alleged symptoms.  ECF No. 10-3 at 18.  The ALJ made no finding of malingering.  Therefore, the ALJ could reject L.R.M.'s "testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Trevizo*, 871 F.3d at 678.

The ALJ gave two rationales for rejecting L.R.M.'s symptom complaints, one based on her physical impairments and the other based on her mental impairments.  ECF No. 10-3 at 20.  Neither satisfies the "clear and convincing reasons" standard.

### 1.      Physical Impairments

According to the ALJ, the evidence shows L.R.M. struggled "with pain and some neurological issues" but that contrary to what L.R.M. claimed, these had "improved somewhat during the period at issue."  ECF No. 10-3 at 20.  The ALJ attributed this in part to the fact that "initially," L.R.M. had said that "she was losing balance daily if she went without a cane," but "more recently," L.R.M. indicated that "she uses a cane 'most of the time outside of her house.'" *Id.*  As such, the ALJ found that the evidence did not show "significant worsening" since L.R.M. stopped working in February 2018 "to support a finding of disability."  *Id.*

However, the ALJ is mischaracterizing the evidence in the record she used to support this

is a position that the Commissioner has asserted in various other Social Security appeal cases. This Court is bound by Ninth Circuit precedent and applies the "clear and convincing reasons" standard to the ALJ's evaluation of L.R.M.'s symptom testimony.

proposition.  In a letter to the Commissioner received by the SSA on February 27, 2020[6], L.R.M. wrote that "she was losing balance daily if she went without a cane."  ECF No. 10-7 at 89–90. She had previously told a medical provider at a June 6, 2019 appointment that "she uses a cane 'most of the time outside of her house.'"  ECF No. 10-8 at 352.  L.R.M.'s letter was written approximately eight months *after* the appointment.  Thus, it is not possible that what L.R.M. wrote in the letter was what she said "initially," and what she told her medical provider was what she said "more recently."  The record does not support the ALJ's finding that L.R.M.'s balance issues had supposedly "improved" despite what L.R.M. claimed.  This is therefore not a clear and convincing reason for rejecting L.R.M.'s pain testimony.

The ALJ also found that L.R.M.'s physical symptom testimony was inconsistent with evidence that she was "partying" and "had been able to go camping over the weekend."  ECF No. 10-3 at 20.  The Ninth Circuit has repeatedly "recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."  *Reddick*, 157 F.3d at 722; *see also Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.1987) (noting that a disability claimant need not "vegetate in a dark room" to be deemed eligible for benefits).  "Only if the level of activity were inconsistent" with L.R.M.'s "claimed limitations would these activities have any bearing on [her] credibility."  *Reddick*, 157 F.3d at 722.

Here, the ALJ cites to medical records from July 7, 2018, which show that L.R.M. went to the emergency room for right arm pain after she was "partying" and her husband fell on her.  *Id.* at 288.  L.R.M. reported that "she was on the ground for some reason."  *Id.*  The medical records, however, do not contain any other details as to what "level of activity" the "partying" entailed. There is no information about whether L.R.M. was at her house or somewhere else, how many people were there, whether she had hosted and planned the party or was just there as a guest, or whether she had been heavily drinking, dancing, moving around, etc.  This single, vague, and ambiguous reference to "partying" without any other supporting details is not a clear and

---

[6] L.R.M.'s letter is not dated, other than the stamp by the SSA indicating when it was received. The letter itself references a January 28, 2020 hearing, as well as the fact that L.R.M. "lost [] hours for child care" for her grandchildren on February 1, 2020.  ECF No. 10-7 at 89, 91.

1    convincing reason to find inconsistency with L.R.M.'s symptom testimony.

2        As for the "camping," the ALJ relied on medical records from June 6, 2019, which show

3    that L.R.M. told her doctor she had multiple mosquito bites from having gone camping that

4    weekend.  ECF No. 10-8 at 352.  As with the "partying," there are no details in the medical

5    records as to the "level of activity" that the camping entailed.  For example, there is no

6    information about where she went, who she went with, or whether she engaged in any outdoor

7    activities while camping or remained only at the camp site.  This reason suffers from the same

8    deficiencies as the reference to "partying," as both activities encompass varying types and

9    intensity of activity.  This non-specific basis is also not a clear and convincing reason for rejecting

10   L.R.M.'s pain testimony.

## 2.    Mental Impairments

12       The ALJ discounted L.R.M.'s mental health symptom testimony in part because the ALJ

13   believed that L.R.M.'s depression and anxiety has generally "responded well" to medications, she

14   was "tolerating a change in medications well," and thus her "impairments have been controlled

15   with medications."  ECF No. 10-3 at 20.  The ALJ relied upon two sets of medical records in

16   support of these specific findings.  The first is from a medical appointment on June 30, 2016,

17   where L.R.M. told her provider that she was "generally feeling much better" and that her "anxiety

18   and depression feel well controlled at this time."  ECF No. 10-8 at 178.  However, this was almost

19   two years before her alleged disability onset date of February 28, 2018.  *See* ECF No. 10-3 at 15.

20   Records from before a claimant's disability onset date are of "limited relevance."  *Carmickle v.*

21   *Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008).  The other is from a medical

22   appointment on May 2, 2019, where the provider noted that L.R.M. had recently began taking

23   Effexor 150mg, an antidepressant, and that she was "tolerating" the medication "well."  ECF No.

24   10-8 at 348.  L.R.M. had taken Effexor in the past, and she reported feeling "okay."  *Id.*  However,

25   L.R.M. also reported at that same appointment "still not sleeping well."  *Id.*  L.R.M. indicated that

26   she was "willing to continue on this regimen" and that she was set to begin counseling the

27   following week.  *Id.*  The fact that L.R.M. was "tolerating" a recent medication change is not

28   strong evidence that her mental health impairments were well-controlled, especially given that she

8

1    simultaneously reported still experiencing symptoms despite the medication.  Nor is "tolerating"

2    the medication change obviously inconsistent with an inability to mentally function in a stressful,

3    workplace environment.

4        More importantly, the Ninth Circuit has held that "it is error to reject a claimant's

5    testimony merely because symptoms wax and wane in the course of treatment.  Cycles of

6    improvement and debilitating symptoms are a common occurrence, and in such circumstances it is

7    error for an ALJ to pick out a few isolated instances of improvement over a period of months or

8    years and to treat them as a basis for concluding a claimant is capable of working.  Reports of

9    'improvement' in the context of mental health issues must be interpreted with an understanding of

10   the patient's overall well-being and the nature of her symptoms.  They must also be interpreted

11   with an awareness that improved functioning while being treated and while limiting environmental

12   stressors does not always mean that a claimant can function effectively in a workplace."

13   *Garrison*, 759 F.3d at 1017 (internal citations omitted).

14       Here, as the ALJ also acknowledges, there is evidence in the record indicating that L.R.M.

15   presented at a May 24, 2018 medical appointment as "anxious appearing."  ECF No. 10-8 at 48,

16   50.  L.R.M. reported at that appointment that she was "feeling very stressed," that she had "a lot

17   going on in her family right now," and she and the provider ultimately "spoke at length about

18   family issues."  *Id.*  At the time, L.R.M. was also on Effexor 150mg for depression.  The record is

19   therefore mixed and contains evidence that L.R.M.'s symptoms "wax and waned" during the

20   course of her mental health treatment.  As such, the ALJ's reliance on certain medical records as

21   evidence of L.R.M.'s improvement with medication is not a clear and convincing reason for

22   rejecting her symptom testimony.  *See Lilita H. v. Kijakazi*, No. 21-CV-04063-JSC, 2022 WL

23   4225395, at *3 (N.D. Cal. Sept. 13, 2022) (holding that the ALJ erred in rejecting the claimant's

24   subjective symptom testimony in part because she "improperly cherry-picked evidence that

25   supported her conclusion while ignoring medical evidence that contradicted her conclusion.").

26       The ALJ also rejected L.R.M.'s mental health symptom testimony because her "mental

27   status examination findings have been mostly unremarkable."  ECF No. 10-3 at 20.  According to

28   the ALJ, even though at the May 24, 2018 medical appointment she presented as "anxious

United States District Court
Northern District of California

9

appearing," L.R.M. has otherwise "presented as cooperative and in no acute distress, and as cooperative and oriented, with clear and coherent speech, and an appropriate mood and affect." *Id.* (internal citations omitted). However, the ALJ also acknowledges that L.R.M. has at other times presented with an "irritable mood and an affect." *Id.* (citing ECF No. 10-8 at 252). Thus, "[t]he record here includes references to both a normal mood and affect and to increased mental health symptoms. Simply pointing to the instances of noted normal or bright mood do not, without a more thorough discussion, show a contradiction between Plaintiff's testimony and the medical record." *Claire G. v. Berryhill*, No. 3:18-CV-00492-HZ, 2019 WL 2287733, at *10 (D. Or. May 28, 2019). This is also not a clear and convincing reason for rejecting L.R.M.'s mental health symptom testimony.

Finally, the ALJ rejected L.R.M.'s mental health symptom testimony because "[t]here is also evidence that the claimant was doing well enough to be partying, and going camping over the weekend." ECF No. 10-3 at 20 (internal citations omitted). The ALJ relies on the same evidence behind her rejection of L.R.M.'s pain testimony. As explained above, the passing, vague, and ambiguous references in the record to "partying" and "camping" do not contain any details as to the "level of activity involved," *Reddick*, 157 F.3d at 722, and are therefore also not clear and convincing reasons for rejecting L.R.M.'s mental health testimony.

### B.    Medical Opinion Evidence

L.R.M. challenges the ALJ's evaluation of medical opinion evidence from: (1) Dr. Molly Malone, a psychiatric consultative examiner; (2) Dr. Dennis Pacl and Dr. H. Jone, the State agency medical consultants at the initial and reconsideration stages; and (3) Heather Abrahimi, Psy.D., and Rita Flanagan, Ph.D., the State agency psychiatric consultants at the initial and reconsideration stages. ECF No. 14 at 14–21. "[A]n ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). In reviewing medical source opinions, an ALJ must "articulate ... how persuasive" he or she finds "all of the medical opinions" based on several factors. 20 C.F.R. § 404.1520c(b). The ALJ must address the two most important factors: supportability and consistency. *Id.* Supportability is "the extent to which

a medical source supports the medical opinion by explaining the 'relevant ... objective medical evidence.'" *Woods*, 32 F.4th at 791 (quoting 20 C.F.R. § 404.1520c(c)(1)).  Consistency is "the extent to which a medical opinion is 'consistent ... with the evidence from other medical sources and nonmedical sources in the claim.'"  *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

An ALJ may, but is not required to, explain how other factors were considered, including the medical source's relationship with the claimant, the length and purpose of the treatment relationship, the frequency of examinations, and the source's specialization.  20 C.F.R. § 404.1520c(b)(2), (c).  If the ALJ finds that two or more medical opinions about the same issue are equally well-supported and consistent with the record but are not exactly the same, then the ALJ will have to articulate how it considered the other factors listed.  20 C.F.R. § 404.1520c(b)(3).  An ALJ satisfies the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725).  "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors, are correct."  *Id.*

### 1.    Dr. Molly Malone

On January 18, 2019, Dr. Malone completed a mental status evaluation of L.R.M. at the request of the Social Security Administration (SSA) as part of its consideration of L.R.M.'s disability benefits application.  ECF No. 10-8 at 250–54.  Dr. Malone opined in part that L.R.M. is moderately to significantly impaired in her ability to "maintain regular attendance in the work place," "complete a normal workday or workweek without interruptions resulting from [L.R.M.'s] psychiatric condition," "interact with coworkers and with the public," and "deal with the usual stresses encountered in [a] competitive work environment."  *Id.* at 253.  She attributed these impairments to L.R.M.'s "emotional lability and avoidance symptoms," "tendency to become easily overwhelmed," "chronic interpersonal difficulties," "poor distress tolerance," and "limited coping skills with propensity toward suicidal ideation."  *Id.*

In terms of supportability, the ALJ found Dr. Malone's opinion to be "unsupported by her own observations of [L.R.M.] as oriented with normal speech, good eye contact, good

concentration, intact insight and judgment, and logical and linear thought processes." ECF No. 10-3 at 22. It is true that Dr. Malone made these observations of L.R.M. as part of her mental status examination findings. *See* ECF No. 10-8 at 251–52. But as noted above, Dr. Malone attributed L.R.M.'s impairments to her "emotional lability and avoidance symptoms," "tendency to become easily overwhelmed and poor distress tolerance," "chronic interpersonal difficulties," and "limited coping skills with propensity toward suicidal ideation," not to the mental status examination findings. *Id.* at 253. The fact that L.R.M. demonstrated "normal speech" and "logical and linear thought processes" during Dr. Malone's evaluation of her does not undermine Dr. Malone's findings as to the psychiatric symptoms she observed in L.R.M. and her opinion as to how these symptoms impact L.R.M.'s ability to function in a workplace environment. *See Dierker v. Berryhill*, No. 18CV145-CAB(MSB), 2019 WL 246429, at *12 (S.D. Cal. Jan. 16, 2019), *report and recommendation adopted*, No. 18CV145-CAB-MSB, 2019 WL 446231 (S.D. Cal. Feb. 5, 2019) (finding that treating psychiatrist's "fairly intact" mental status examination findings were of "limited relevance" to the psychiatrist's "opinions regarding [the p]laintiff's mental work-related limitations"); *see also Garrison*, 759 F.3d at 1017, n.22 (noting that "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate.").

In terms of consistency, the ALJ found that Dr. Malone's opinions were "inconsistent with the record as a whole, which does not document significant and persistent mental status deficits, and otherwise shows good response to medications." ECF No. 10-3 at 22. However, the ALJ cited to nothing from the record in support of this finding, which is error. *See Rosemarie V. v. Kijakazi,* No. 21-CV-02192-AGT, 2022 WL 4099457, at *8 (N.D. Cal. Sept. 7, 2022) ("[T]he ALJ failed to provide any record citations to support the finding that Dr. Catlin's opinion was inconsistent with the longitudinal record, leaving the Court to guess which specific record evidence the ALJ found inconsistent with Dr. Catlin's opinion") (internal citation omitted).

Finally, the ALJ found that Dr. Malone's opinion was inconsistent with notes in the record indicating that L.R.M. had "sufficient mental functioning" to go "partying" and "camping for a

weekend." ECF No. 10-3 at 22.  As explained above, this evidence is not a clear and convincing reason for rejecting L.R.M.'s symptom testimony.  Similarly, here, because the references in the record to L.R.M. "partying" and "camping" are ambiguous, they cannot support any conclusion (one way or the other) as to the consistency of Dr. Malone's opined physical or mental limitations for L.R.M. with the record as a whole.  Therefore, this also not a reason supported by substantial evidence for rejecting Dr. Malone's medical opinion.

### 2.   Dr. Dennis Pacl and Dr. H. Jone

At the initial stage, as part of the SSA's Disability Determination Explanation, Dr. Dennis Pacl conducted a Physical Residual Functional Capacity Assessment of L.RM., dated January 17, 2019.  ECF No. 10-4 at 12–13.  Dr. Pacl found that L.R.M. had some exertional and postural limitations, which made it so that she could only, *inter alia*, frequently lift and/or carry 10 pounds, stand and/or work for about 6 hours in an 8-hour workday, and climb ramps, stairs, ladders, ropes, and scaffolds occasionally.  *Id.* at 12.  Dr. Pacl explained that these findings were based in part on the fact that L.R.M. had a "mildly slowed gait," "motor strength intact," and "[n]o [assistive device] anywhere."  *Id.* at 13.  At the reconsideration stage, Dr. Jone also conducted a Physical Residual Functional Capacity Assessment of L.R.M., dated March 20, 2019, and agreed with Dr. Pacl's findings.  *Id.* at 29–31.  Dr. Jone opined that L.R.M. is "able to perform light work as is outlined as [sic] initial level" in part because she showed only a "mild slowed" gait, her strength and sensation were "intact," and her x-rays were negative.  *Id.* at 31.

The ALJ found both opinions "partially persuasive, to the extent they are consistent with the totality of the evidence in acknowledging some extent of the claimant's exertional and postural limitations."  ECF No. 10-3 at 21.  According to the ALJ, both physicians are "duly qualified," they are both experts in disability evaluation, and they both "reviewed a sizeable portion of the evidence and cited specific medical findings to substantiate their opinions."  *Id.*  But as with Dr. Malone, the ALJ failed to cite any evidence from the record in support of this conclusion, which is error.  *See Rosemarie*, 2022 WL 4099457, at *8.  And the ALJ also failed to explain how she specifically considered the supportability and consistency factors as required by 20 C.F.R. § 404.1520c(b).  Instead, the ALJ simply made conclusory statements as to the opinions'

13

1    supportability and consistency.  This too is error.

2           The ALJ did admit that "additional treatment records" received after Drs. Pacl and Jone

3    offered their medical opinions show in part that L.R.M. does use a cane when outside her home,

4    that she "received another set of block injections," and that she "was told to visit neurology."  *Id.*

5    According to the ALJ, the additional records "documented treatment history and reports of pain

6    and other limitations" and supported "more restrictive postural limitations and precautionary

7    environmental limitations."  *Id.*  L.R.M. argues that the ALJ's error was not harmless in part

8    because these additional treatment records contradict Dr. Pacl's findings, which were based in part

9    on his observation that there was "[n]o [assistive device]" documented anywhere in her medical

10   record.  ECF No. 10-4 at 13.  She also argues that a cane "is also (and first) an exertional

11   limitation," ECF No. 14 at 19, and not just a postural or environmental limitation, as the ALJ

12   found.

13          The question of whether the ALJ may have erred in her assessment of L.R.M.'s need for a

14   cane, and whether the ALJ incorporated that into L.R.M.'s RFC, is discussed further below.  For

15   purposes of the ALJ's evaluation of the opinions of Drs. Pacl and Jone, the fact that the ALJ

16   acknowledged that their opinions were only "partially persuasive" because they did not review

17   these additional treatment records means that the ALJ did not err, at least in this regard.  *See*

18   *Bullock v. Comm'r of Soc. Sec. Admin.*, No. CV2100722PHXJJTCDB, 2022 WL 4538576, at *22

19   (D. Ariz. Aug. 18, 2022), *report and recommendation adopted*, No. CV2100722PHXJJTCDB,

20   2022 WL 4535241 (D. Ariz. Sept. 28, 2022) (rejecting contention that the ALJ committed legal

21   error by relying on "stale" State agency consultant opinion where the ALJ only gave the opinion

22   "partial weight" and acknowledged that the opinion "did not take into account the subsequent

23   medical providers' records with regard to [the plaintiff's] limitations arising from his back

24   problems.").

25                **3.      Heather Abrahimi, Psy.D., and Rita Flanagan, Ph.D.**

26          Also at the initial stage, as part of the SSA's Disability Determination Explanation, Dr.

27   Abrahimi conducted a Mental Residual Functional Capacity Assessment of L.R.M., dated

28   February 14, 2019.  ECF No. 10-4 at 13–15.  Dr. Abrahami found that L.R.M. had understanding

United States District Court
Northern District of California

1   and memory limitations, sustained concentration and persistence limitations, social interaction

2   limitations, and adaptation limitations.  *Id.*  However, she found that L.RM. was either not

3   significantly limited or moderately limited in each area.  *Id.*  According to Dr. Abrahimi, L.R.M. is

4   "capable of understanding, remembering and sustaining concentration, pace and persistence for

5   simple routines throughout a normal workday/workweek," "able to accept routine supervisions

6   and interact with co-workers…," "capable of brief and infrequent public contact," and "capable of

7   adapting to a routine and predictable work environment…"  *Id.* at 15.  At the reconsideration

8   stage, Dr. Flanagan also conducted a Mental Residual Functional Capacity Assessment, dated

9   March 22, 2019.  Id. at 31–33.  Dr. Flanagan found that L.R.M. had no understanding and memory

10   limitations or adaptation limitations but did have sustained concentration and persistence

11   limitations and social interaction limitations.  *Id.*  She also found that L.R.M. was either not

12   significantly limited or moderately limited in each area.  *Id.*  According to Dr. Flanagan, L.R.M. is

13   "able to accept routine supervision and interact with co-worker…," "capable of brief and

14   infrequent public contact," and "capable of adapting to a routine and predictable work

15   environment…"  *Id.* at 33.

16        The ALJ found both opinions "partially persuasive as they are generally consistent with the

17   record in showing an individual who has remained mostly functional from a mental standpoint."

18   ECF No. 10-3 at 21.  According to the ALJ, the two doctors "reviewed most of the evidence and

19   cited specific findings in support of their opinions."  *Id.*  But though the ALJ agreed that "some

20   social limitations" were warranted given evidence that L.R.M. presented at times as "anxious

21   appearing and with an irritable mood and affect," the ALJ refused to adopt their proposed

22   limitation for L.R.M. of "simple routines/predictable work environment."  *Id.*

23        Once again, as with the opinions of Dr. Malone and Drs. Pacl and Jone, the ALJ failed to

24   cite any evidence in support of her conclusion that the opinions of Drs. Abrahimi and Flanagan

25   were partially persuasive, which is error.  *See Rosemarie*, 2022 WL 4099457, at *8.  Nor did the

26   ALJ explain specifically how she considered the supportability and consistency factors as required

27   by 20 C.F.R. § 404.1520c(b).  The ALJ does not explain how the opinions of Drs. Abrahimi and

28   Flanagan are consistent with the record "in showing an individual who has remained mostly

United States District Court
Northern District of California

15

functional from a mental standpoint." ECF No. 10-3 at 21.  Nor does she explain what "specific findings" support their opinions.  *Id.*

The ALJ did elaborate slightly on her refusal to adopt the limitation proposed by Drs. Abrahimi and Flanagan of "simple routines/predictable work environment." *Id.*  The ALJ noted that "[t]he record simply does not document ongoing difficulties with memory, focus, concentration, or adaptation/managing oneself." *Id.*  Instead, the ALJ emphasized that records note L.R.M. as "cooperative and oriented, with clear and coherent speech, and an appropriate mood and affect." *Id.*  According to the ALJ, "the record shows good overall response to medications and mostly unremarkable mental status examination findings." *Id.*

The ALJ's only citation here is to records from a December 16, 2021 medical appointment where the provider noted that L.R.M.'s cognition and speech was "[o]riented" with "[s]peech clear and coherent," and that for her psychiatric status examination, she was "[c]ooperative" with "[a]ppropriate mood & affect." ECF No. 10-8 at 413.  As with Dr. Malone's opinion, the ALJ failed to explain how "normal" or "unremarkable" mental status examination findings are inconsistent with Drs. Abrahimi and Flanagan's opinions on L.R.M.'s "mental work-related limitations." *Dierker*, 2019 WL 246429, at *12.  Moreover, the ALJ acknowledged that L.R.M. at times "present[ed] as anxious appearing and with an irritable mood and affect." ECF No. 10-3 at 21.  If anything, the record shows that L.R.M.'s symptoms "wax and waned," which cautions against a finding that there has been significant improvement such that L.R.M. "can function effectively in a workplace." *Garrison*, 759 F.3d at 1017.  In terms of the ALJ's conclusion that L.R.M. showed a "good overall response to medications," as explained above, the medical evidence which the ALJ relies upon with respect to L.R.M.'s medication use does not support a finding that L.R.M.'s mental health symptoms have "improved" while on medication.

### C.     Third-Party Witness Testimony

L.R.M. also challenges the ALJ's evaluation of testimony from three third-party witnesses: (1) J.M., her husband; (2) A.M., her daughter; and (3) D.J., her mother.  After briefly summarizing the testimony of each witness, the ALJ found that their statements "generally mirror those of [L.R.M.] and were considered in assessing [L.R.M.'s] exertional, postural, environmental, and

United States District Court
Northern District of California

1   mental limitations." ECF No. 10-3 at 23. The ALJ noted that none of the witnesses are

2   "medically trained to make exacting observations regarding frequencies, types, and degrees of

3   medical signs and symptoms," but acknowledged that their "statements give a unique, longitudinal

4   portrait of [L.R.M.'s] conditions and daily lifestyle." *Id.*

5       "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take

6   into account, unless he or she expressly determines to disregard such testimony and gives reasons

7   germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). "One

8   reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."

9   *Id.* In addition, where the ALJ provides "clear and convincing reasons for rejecting [the

10  claimant's] own subjective complaints," and the lay witness testimony is "similar to such

11  complaints, it follows that the ALJ also gave germane reasons" for rejecting the lay witness

12  testimony. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).

13      Here, though the ALJ admits to "considering" the testimony from L.R.M.'s husband,

14  daughter, and mother, no reasons, "germane" or otherwise, are given for disregarding it. This is

15  error. The Commissioner argues that any error committed by the ALJ in evaluating the third-party

16  witness testimony was "harmless where the same evidence that the ALJ referred to in discrediting

17  [the claimant's] claims also discredits the lay witness's claims." ECF No. 19 at 8 (quoting

18  *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012)). Even if the Court assumes that the ALJ

19  meant to reject the testimony from L.R.M.'s husband, daughter, and mother for the same reasons

20  given to reject L.R.M.'s subjective symptom testimony, as explained above, the ALJ did not

21  provide "clear and convincing reasons" supported by substantial evidence for rejecting L.R.M.

22  symptom testimony. As such, those reasons cannot be a "sufficient basis" for rejecting the third-

23  party testimony as well. *See Alice B. v. Kijakazi*, No. 20-CV-05897-DMR, 2021 WL 6113000, at

24  *8 ("Because the court finds that the ALJ's reasons for rejecting [the p]laintiff's testimony were

25  not supported by substantial evidence, the court cannot apply those reasons to [the p]laintiff's

26  mother's testimony to find the error harmless.").

27      **D.    ALJ's Assessment of L.R.M.'s RFC**

28      L.R.M. argues that the ALJ erred in assessing her RFC because the ALJ failed to consider

United States District Court
Northern District of California

17

all of L.R.M.'s impairments and limitations, severe and nonsevere.  ECF No. 14 at 24–26.  She challenges the ALJ's omission from her RFC of a hand-held assistive device (walking cane) limitation, tennis elbow (lateral epicondylitis)[7], recurrent urinary tract infections (UTIs), adjustment disorder diagnosis, as well as the impairments found by Dr. Malone with respect to L.R.M.'s ability to maintain regular attendance in the workplace, interact with coworkers and the public, deal with the usual stresses encountered in a competitive work environment, etc.  *Id.*

A Social Security claimant's RFC is what the claimant is capable of doing despite his or her mental and physical limitations.  20 C.F.R. § 404.1545(a)(1); *Valentine*, 574 F.3d at 689; *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001).  An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p: Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *1 (July 2, 1996).  "In determining a claimant's residual functional capacity, the ALJ must consider all of a claimant's medically determinable impairments, including those that are not severe."  *Ghanim v. Colvin*, 763 F.3d 1154, 1166 (9th Cir. 2014) (citing 20 C.F.R. § 404.1545(a)(2)).  The ALJ must consider all relevant evidence in formulating an RFC, and "an RFC that fails to take into account a claimant's limitations is defective."  *Valentine*, 574 F.3d at 690.

However, while the regulations require that the ALJ "consider the effect of all plaintiff's impairments in formulating the RFC, they do not require him to translate every non-severe impairment into a functional limitation in the RFC."  *Rania v. Kijakazi*, No. 220CV01541MCECKDSS, 2021 WL 5771663, at *3 (E.D. Cal. Dec. 6, 2021), *report and recommendation approved*, No. 220CV01541MCECKDSS, 2022 WL 95228 (E.D. Cal. Jan. 10, 2022); *see also Medlock v. Colvin*, No. CV 15-9609-KK, 2016 WL 6137399, at *5 (C.D. Cal. Oct. 20, 2016) ("Consideration of 'the limiting effects of all impairments' does not necessarily require the inclusion of every impairment into the final RFC if the record indicates the non-severe impairment does not cause a significant limitation in the plaintiff's ability to work.").  "Provided

---

[7] L.R.M. also refers to this as "right upper extremity limitations from decreased sensation."  ECF No. 14 at 25–26.

United States District Court
Northern District of California

1    the ALJ does not rely on boilerplate language, but actually reviews the record and specifies

2    reasons supported by substantial evidence for not including the non-severe impairment, the ALJ

3    has not committed legal error." *Medlock*, 2016 WL 6137399 at *5.

4         Here, the ALJ did not engage in any meaningful discussion anywhere in her opinion as to

5    L.R.M.'s recurrent UTIs or adjustment disorder diagnosis.  However, "the ALJ need not discuss

6    every piece of evidence; rather, the ALJ need only discuss evidence that is significant and

7    probative." *Pierce v. Berryhill*, No. EDCV 16-00617-DTB, 2017 WL 2402829, at *3 (C.D. Cal.

8    May 31, 2017).  "The existence of an impairment, diagnosis, or symptoms, does not mean that

9    Plaintiff suffered from a significant limitation in his ability to perform work activities." *Eduardo*

10   *Corona M. v. Berryhill*, No. 2:17-CV-09061-AFM, 2019 WL 718111, at *3 (C.D. Cal. Feb. 19,

11   2019).  It is not enough that L.R.M. point to evidence indicating she was treated for these

12   conditions, she must also cite to evidence in the record explaining how these conditions affect her

13   ability to work.  *See Pierce*, 2017 WL 2402829, at *3 (C.D. Cal. May 31, 2017) (rejecting claim

14   that ALJ erred in failing to discuss evidence, explaining, "[a]lthough plaintiff cites various

15   medical records describing her conditions, symptoms, and treatment, she does not show how such

16   evidence translates into any specific functional limitations.").

17        The only evidence that L.R.M. cites as to her adjustment disorder indicates that it is one of

18   many medical conditions on her "problem list."  *See* ECF No. 10-8 at 337, 388.  She does not

19   point to anything in the record explaining how the adjustment disorder manifests itself in terms of

20   symptoms or how it affects her ability to function in a workplace.  As for the recurrent UTIs,

21   L.R.M. contends that this "shows up across all of" her medical records and that her mother

22   "specifically called [the recurrent UTIs] out as one of the conditions that combined with other

23   problems prevented her daughter from being able to work."  ECF No. 14 at 26.  But again, the

24   medical records L.R.M. cites only indicate that recurrent UTIs is one of many medical conditions

25   on her "problem list."  See ECF No. 10-8 at 10–11, 356–57, 410.  L.R.M.'s mother did provide an

26   undated letter where she listed L.R.M.'s health problems, but the letter contains no explanation as

27   to how specifically any of them affect Ms. Mosna's ability to work.  *See* ECF No. 10-3 at 85.  The

28   ALJ thus did not err in failing to discuss either the adjustment disorder or L.R.M.'s recurrent UTIs

as part of the RFC assessment.

As for tennis elbow, the ALJ did discuss L.R.M.'s symptoms briefly.  The ALJ noted that at an October 2018 medical appointment, L.R.M. had "decreased sensation of the right arm."  ECF No. 10-3 at 19 (citing ECF No. 10-8 at 98).  But the ALJ did not otherwise account for any tennis elbow symptoms in the RFC assessment.  L.R.M. points to evidence indicating that she was "routinely treated for tennis elbow" and that it "continue[d] to be listed as a confirmed problem in 2021."  ECF No. 14 at 26.  However, as with the adjustment disorder and recurrent UTIs, most of the evidence she cites indicates only that tennis elbow is one of several diagnosed medical conditions on her "problem list."  *See* ECF No. 10-8 at 11, 22, 244–45, 410–411.  L.R.M. does point to evidence indicating that L.R.M.'s sensation was diminished as to both "light" and "sharp" touch in her right arm (*id.* at 98), and that she was "tender" and "sensitive" in her right hand (*id.* at 217).  But none of this evidence explains in any detail specific ways in which L.R.M.'s tennis elbow prevents her from being able to function in a workplace.

L.R.M. also specifically challenges the ALJ's assessment of her need for a cane.  She argues that the ALJ erred in part by getting "the medical history of cane use backwards."  ECF No. 14 at 25.  As noted above, the ALJ mischaracterized the record as to L.R.M.'s statements regarding her use of a cane, specifically, the timing of when she made those statements.  The ALJ thus did err in this regard, but with respect to whether the ALJ erred in omitting from L.R.M.'s RFC a walking cane limitation, "[t]he use of a cane is a functional limitation only if it is medically required."  *Blandina F. v. Kijakazi*, No. 2:21-CV-00140-SP, 2022 WL 4537863, at *3 (C.D. Cal. Sept. 28, 2022) (citing SSR 96-9p: Titles II and XVI: Determining Capability to do Other Work: Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work, 1996 WL 374185, at *7 (July 2, 1996)).  "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  *Id.*

Though there are several medical records documenting L.R.M.'s cane use (*see, e.g.*, ECF

United States District Court
Northern District of California

No. 10-8 at 348, 351–52, 354, 390, 412), L.R.M. points to no "medical documentation establishing the need for an assistive device." *Flores v. Colvin*, No. 1:14-CV-02096-SKO, 2016 WL 2743228, at *14 (E.D. Cal. May 11, 2016) (noting that "the record is replete with references to [the plaintiff's] use of a cane, but those mentions are all traceable to Plaintiff's self-reports and to his medical sources' observations that he presented with an assistive device."). There is one medical record from an April 16, 2019 appointment with Susan Klimist-Zingo, PA which says: "We asked her to obtain a cane to help her with ambulation." ECF No. 10-8 at 347. But a passing reference to a provider asking L.R.M. to obtain a cane is not the same as evidence establishing that the cane is medically necessary. *See Allen O. v. Comm'r of Soc. Sec.*, No. 3:19-CV-02080-BR, 2020 WL 6505308, at *7 (D. Or. Nov. 5, 2020) ("Although Plaintiff's medical provider recommended the use of a walking stick or a cane, there is not any other evidence that either was required."). Ultimately, L.R.M. has "failed to cite any unambiguous medical opinion describing the circumstances for which the use of a cane would be needed pursuant to SSR 96-9p." *Flores*, 2016 WL 2743228, at *15. As such, the ALJ did not err here.

Finally, as to the limitations opined by Dr. Malone, because the ALJ erred in her evaluation of Dr. Malone's medical opinion, as explained above, she also necessarily erred as to her RFC assessment to the extent it did not properly account for Dr. Malone's opinion. *See K.F. v. Kijakazi*, No. 20-cv-08629-LB, 2022 WL 207661, at *12 (N.D. Cal. Jan. 24, 2022) ("The plaintiff contends that the ALJ improperly assessed her RFC because he ignored certain medical diagnoses and opinions. Because the court remands for reconsideration of the medical-opinion evidence, and because the RFC was based partly on the medical record, the court remands on this ground too.").

### E.    Step Five Findings

L.R.M. also challenges the ALJ's findings at step five of the five-step sequential evaluation process. At step five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in significant numbers in the national economy. *Hoopai*, 499 F.3d at 1074. L.R.M. argues that the Commissioner failed his burden of proof at step five because the vocational expert's (VE) testimony has no evidentiary value, since the ALJ did not include L.R.M.'s cane limitation in the hypotheticals posed to the VE. ECF No. 14 at 28–29.

United States District Court
Northern District of California

1    "As discussed above, the ALJ properly assessed Plaintiff's RFC without incorporating an

2    unsupported restriction to the use of or reliance upon a cane.  Without objective medical evidence

3    that [Plaintiff] needed a cane[,]…there was no reason to include [Plaintiff]'s subjective use of

4    th[at] device[ ] in the hypothetical to the VE."  *Flores*, 2016 WL 2743228, at *15.

5            **F.    ALJ Duty to Unrepresented, Mentally Impaired Claimant**

6            L.R.M. challenges the ALJ's purported failure in her heightened duty to fully develop the

7    record, given that L.R.M. was both self-represented and suffered from mental impairments.  ECF

8    No. 14 at 26–27.  Specifically, L.R.M. notes that there are no medical records in her file from

9    August 2019 through November 2021, inclusive, even though she indicated in February 2020 that

10   she continued to see one of her medical providers regularly.  *Id.*  In addition, medical records from

11   December 2021 include a summary of radiology findings from July 2020.  *Id.*  L.R.M. contends

12   that these missing medical records are supportive of her claimed limitations and the ALJ had a

13   duty to obtain and review them.  *Id.*

14           It is well established that "[i]n Social Security cases the ALJ has a special duty to fully and

15   fairly develop the record and to assure that the claimant's interests are considered."  *Brown v.*

16   *Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).  "Given that a large portion of Social Security

17   claimants either have no representation at all or are represented by non-attorneys" (*Sims v. Apfel*,

18   530 U.S. 103, 112 (2000)), courts have recognized that "[w]hen the claimant is unrepresented ...

19   the ALJ must be especially diligent in exploring for all the relevant facts."  *Tonapetyan v. Halter*,

20   242 F.3d 1144, 1150 (9th Cir. 2001).  "The ALJ's duty to develop the record fully is also

21   heightened where the claimant may be mentally ill and thus unable to protect her own interests."

22   *Id.*  This duty, however, is only "trigger[ed]" when there is "[a]mbiguous evidence" or the ALJ

23   "find[s] that the record is inadequate to allow for the proper evaluation of evidence."  *Id.*

24           L.R.M. makes no argument that either circumstance triggering the ALJ's heightened duty

25   applies here.  That the ALJ perhaps erred in her analysis of the record at certain steps of the five-

26   step sequential evaluation process does not mean that the evidence was ambiguous or the record

27   inadequate.  The missing medical records may have provided stronger support for L.R.M.'s

28   disability claim, but this does not mean that the ALJ erred in not hunting them down, because "[a]t

                                                    22

1   all times, the burden is on the claimant to establish her entitlement to disability insurance

2   benefits." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998); *see also* 20 C.F.R. § 404.1512(a)(1)

3   ("In general, you have to prove to us that you are blind or disabled.  You must inform us about or

4   submit all evidence known to you that relates to whether or not you are blind or disabled (see

5   § 404.1513).  This duty is ongoing and requires you to disclose any additional related evidence

6   about which you become aware.").

7           **G.      Remand or Award of Benefits**

8           Finally, L.R.M. requests that the Court remand the case for automatic payment of benefits

9   instead of further proceedings.  ECF No. 14 at 29–30.  In the Ninth Circuit, there is a three-part

10  test to determine whether remand with instructions to award benefits is appropriate: "(1) the record

11  has been fully developed and further administrative proceedings would serve no useful purpose;

12  (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether

13  claimant testimony or medical opinion; and (3) if the improperly discredited evidence were

14  credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*,

15  759 F.3d at 1020.  "Remand for an award of benefits" is usually reserved for "rare circumstances."

16  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1100 (9th Cir. 2014).

17          L.R.M. first argues that Dr. Malone's findings at step three of the five-step sequential

18  evaluation process compelling a finding by the ALJ that L.R.M. is per se disabled.  ECF No. 29–

19  30.  According to L.R.M., at step three, the ALJ considered listed impairments 12.04 and 12.06,

20  and under either, L.R.M. had to be found per se disabled if she had two or more marked

21  impairments.  *Id.*  Because Dr. Malone opined that L.R.M. had greater than moderate impairment

22  in four areas, and "these hit at least three of the four paragraph B criteria, paragraphs B(2)–(4),

23  L.R.M. "would have to be found disabled on remand at Step three" and "the Court should remand

24  solely for the immediate calculation and certification for payment of benefits."  *Id.*

25          As noted above, the Court finds that the ALJ erred in her evaluation of Dr. Malone's

26  medical opinion under 20 C.F.R. § 404.1520c.  Under the "ordinary remand rule," which applies

27  to Social Security cases, when "the record before the agency does not support the agency action"

28  or "the agency has not considered all relevant factors…the proper course, except in rare

United States District Court
Northern District of California

circumstances, is to remand to the agency for additional investigation or explanation." *Treichler*, 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). "The touchstone for an award of benefits is the existence of a disability, not the agency's legal error.  To condition an award of benefits only on the existence of legal error by the ALJ would in many cases make disability benefits ... available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) (internal quotation marks omitted).  Therefore, the Court will not remand for immediate payment of benefits on this basis.

In addition, L.R.M. argues that the VE's testimony compels finding her disabled in part because "the VE testified that at her skill level missing more than one day of work a month would not be tolerated by an employer."  ECF No. 14 at 30 (citing ECF No. 10-3 at 74).  Assuming without deciding that the ALJ committed legal error in her evaluation of the VE's testimony—the Court notes that L.R.M.'s only challenge to the ALJ's evaluation of the VE's testimony is as to her omittance of a cane limitation from the hypotheticals posed to the VE—this would still be "exactly the sort of issue[] that should be remanded to the agency for further proceedings." *Brown-Hunter*, 806 F.3d at 495 (quoting *Treichler*, 775 F.3d at 1105).  Accordingly, the Court finds that remanding for immediate payment of benefits is not appropriate in this case.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment, **DENIES** Defendant's Cross-Motion for Summary Judgment, and **REMANDS** for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: September 9, 2024

LISA J. CISNEROS
United States Magistrate Judge

24